This afternoon is case number 4-17-0755, Illinois Environmental Protection Agency and Illinois Pollution Control Board and Brickyard Disposal and Recycling Incorporated. Counsel, could you state your appearances for the record, please? My name is Attorney General Carl Gillespie for the Illinois Environmental Protection Agency. Hi. Good afternoon, Your Honor. Claire Manning on behalf of Brickyard Disposal and Recycling Incorporated. Good afternoon, Your Honor. Mark Powell on behalf of the Illinois Pollution Control Board. All right. Thank you. And Mr. Powell and Ms. Manning, it's my understanding you've agreed to split your time ten minutes apiece? Yes, Your Honor. Okay. All right. Thank you. Counsel, you may proceed. Thank you, Your Honor. May it please the Court, this is a case about statutory interpretation, Your Honors. At issue is whether a municipal waste facility in Vermillion County must obtain proof of local siting from the County Board before its permit application can be processed by the agency, the Illinois Environmental Protection Agency. Brickyard's permit application seeks to fill an area of its existing facility, approximately 1 million cubic yards, that is currently permitted to receive inert material with solid municipal waste. This change to its operation will extend the useful life of the facility approximately five years. The parties agree that the operative language and statutes are found in Section 39 and Section 330B of the Act. provides that the agency may not grant a permit for the development of a new pollution control facility unless the applicant has submitted proof to the agency that the facility's location has been approved by the County Board. What makes it new? Your Honor, Section 3.330B defines a new pollution control facility as the area of expansion beyond the boundary of a currently permitted pollution control facility. Is this inside the boundary? No, the application seeks to put waste in an area that's outside the waste boundary, although it's inside the facility's boundary. So it's an expansion... Inside the facility, but it's not... Yes, this is an expansion inward into an area that's not permitted. What was the purpose of the wedge to begin with? The wedge was to keep Unit 1 and Unit 2 separated. Why? Because there were different regulations governing Unit 1 and Unit 2, and it was necessary to make sure that the material in Unit 1 and the water coming from Unit 1 was not entering Unit 2. So that's the purpose of the wedge. Their proposal was to remove that wedge and replace it with a thin liner, gaining that extra space. But in doing that, they're actually extending the facility beyond the current boundary that is listed in its current permit. It's my contention that the statutory words, currently permitted pollution control facility, are a reference to Brickyard's current permit, and that the word boundary in the statute is a reference to the permit boundaries that designate where in the facility waste can and cannot go. So, at issue is the intent of the General Assembly in using the words it chose, and the touchstone for judging its intent are the words. The disputed provision explicitly refers to boundary of the currently permitted pollution control facility, but the board in its decision did not use the current permit facility boundaries in ascertaining whether there's an expansion. It used a sighting from a prior permit, from a permit issued in 1992. That's not what the statute requires. Let me ask you a question. Unit 1 and Unit 2, you don't have, or you have the wedge between them. Am I permitted, as a disposal company, to make Unit 1 bigger just by extending its perimeter? As long as I'm still inside the original boundary. You'd need to secure another permit from the agency to do that, Your Honor. So it can't become larger? It can, but it would need a permit to do it. It would be expanding Unit 1 beyond the boundary of its current permit, and if you look at the current permit... So its current permit would be so specific as to say the edge of it has to be this many yards or feet away from the outside boundary of the area that we... Yes, your record contains a map of the waste boundary for the current permit, and the current waste boundary shows that the wedge area has a border around it over which waste may not go. If you want to put waste into that space, you'd need a permit because you'd be creating a new pollution control facility. Our argument is essentially that the language of the statute is specifically applicable to this case. That's exactly what they're doing, and for that reason, Brickyard needs a new permit. They need to get permitted as a new pollution control facility requiring local siting from Vermilion County. Now why do I say the permit boundary in the statute is a reference to the current waste boundary in the permit? And the reason is because we have an Illinois Supreme Court decision and a decision from the Fifth District which clarifies these terms, these boundary terms. Both of these cases interpret Section 3330 of the Act. In MIG, the court concluded that within the context of the statute, both the lateral and the vertical dimensions of the facility's boundaries matter for calculating whether a new permit is required. In MIG, the operator wanted to simply extend the facility upwards, and the operator argued that that wouldn't cross a boundary, but the court said no, it would cross a boundary. It would cross the boundary that capped the facility, and so a new permit was required. In MIG, MIG specifically stated that the expansions are measured against the waste volume limits set out by the agency permit. In Bi-State, the facility operators wanted to do quite the same thing that Brickyard is trying to do here, which is to expand its facility not upward and not past the lateral boundaries, but across a boundary that exists in the middle of the facility. The court held that inward expansions beyond the permanent boundaries are no different, and applied the same MIG analysis, M-I-G. The court specifically held that the word currently in the statute means as at the present time. That's at 2-0-3-11-3 at 10-27. So the court is clear in Bi-State and in MIG that what we're looking at is the current permit, not a previous permit. And if we look at the current permit, we can see waste boundaries, and it's clear that they're crossing a waste boundary in the proposal. And in fact, crossing a boundary to increase the capacity of the facility by a million cubic yards, which is a very substantial expansion. Even if there were ambiguity in the statute, and it's my contention that there is no ambiguity, the agency's determination as to how to read the statutory text should be given deference if this court is inclined to do that. Because as the court explained in the city of Waukegan, as between the board and the agency when it comes to permitting issues, it is the agency that is charged as being the gatekeeper for the statute. The agency is the one with experience and expertise in permit issues. Bi-State explains that the question about whether local siting is required is really about the scope and nature of the facility. Here, there can be no argument or no reasonable argument that Brickyard's application won't change the scope and nature of this facility. It's going to extend this facility's operational life five years. That's five years the people of Vermilion County will have waste facility running in their community. It's five years of waste on the county roads. It's five years of whatever problems come with the facility. It's five years they won't have a covered facility at that location. And there can be no doubt either, although there's some confusion perhaps, that there is an expansion here. It's not simply a putting back into the facility material that was once there. Because we know in 1995 there was a change to this facility. It was expanded in 1995. The floor was lowered. The slopes were changed. The cover was thin. So the million cubic yards that Brickyard lost when they inserted the wedge, they got back in 1995. That's why the facility's life is being extended five additional years. Because it was put back into the facility in 1995. Now Brickyard's asking to extend again so that they would take an additional million cubic yards. I want to make the point also that our interpretation of the statute is the only interpretation that's consistent with the broad policy implications of the Act. In 1991 the statute was changed to allow local government input into the siting process. Without the agency getting proof of local siting, the board's decision essentially eliminates any possibility that local government would have any say in this. So that's another reason why. The application was denied in this case because Brickyard did not tender a certificate showing that the local government had approved the site. Instead they tendered documents from 1991 and 1992 showing that in a previous permit there was material there that was waste. But the agency needs input from Vermillion County to know whether it's approved local siting. It's my contention that it's necessary to show current approval of a current proposal. Brickyard's argument is that they could use a past occurrence from 1992. But even if that were true, and it's not, even if it were true, the agency is entitled to have the current Vermillion County board certify materials showing what was approved in the prior siting. And the board didn't get any of that material here. There's no certificate from Vermillion County explaining what was approved in 1992. And that's important. The application process, which has been in place since at least 2012, requires the local government to certify the completeness and the accuracy of the prior local siting, including explaining what was locally sited. Where is Vermillion County? Your Honor, I believe it's... Why are they here? I know where it is, Junior. Thank you for... Why are they here? They were not brought into the process because they were never asked to certify their... Do I know about this? I don't know, Your Honor. That's a question I think should be directed to the board and Brickyard. Well, I will ask them. But it seems like if there's local interest and the need for local control, I don't think, from what I've read in other cases, that the Vermillion County board is bashful about asserting its authority or presumed authority. Your Honor, form LPCPA8 is a two-page form. It's on the Internet. It goes to the county and it says, we're expanding this facility. Please show us or give us records that show local siting. That should have been tendered. When the agency received this application, that form was not included. If it had been included, it would have been a certificate from Vermillion County. And then I would be able to tell you what their position is because it would have been set out on that form. But their position wouldn't matter. According to what you've said about the expansion? No. I believe their position is we would know from their record, the record that we have for the current application, what was approved in the prior siting. But we wouldn't know if there was any approval for what is presently being proposed. We'd know if the current board approved this, then this form would say we certify that we approved it. And we'd have a certificate from a county officer. And the form specifically provides that the county officer's name and contact information is on the form because the agency may have to contact the Vermillion County to confirm all of this. We've got none of that material. Now, in this case, the Brickyard is saying, well, we can use a prior from 1992 approval from the Vermillion County Board. If you got an official record from them, why would you need to confirm it? Because it needs to be under the Section 39. It needs to be proof. And photocopies of something that came from 1992 wouldn't be proof. If we had a county officer certifying the completeness and the authenticity of a local siting, now, I think it has to be a local siting from 2015 at the time of the application, the current permit. My opponents say, oh, we can use a permit application back from 1992. But in either case, we should have a certificate from Vermillion County certifying what it was that was approved. And I don't want to concede that the 1992 application would be sufficient. If Vermillion County was aware of this proceeding before the Board and concerned about it, would they have sought to intervene? I believe they could have, Your Honor. I'm not certain about that. Maybe my opponents could explain that. Vermillion County isn't that big, and I suspect that this is a matter which somebody over there must know about. Is there any inference we can draw from the fact that they didn't petition to intervene? No, I think the only inference is that they weren't asked to certify the record. And if they had asked to certify the record, we'd know. I think the obligation to show local siting by the statute is very much on the applicant. And whatever they want to use to show local siting needs to be in the form of a certified record from Vermillion County. Well, I understand that's your argument, but my point being is the brickyard was arguing to the Board, who ultimately accepted the idea that this was not covered by the statute. They didn't need to get the approval of the local county board. And given the litigation that was going on, you know, there's always one of two responses. Someone wins and someone loses. You might not know for sure who's going to do it. But if you're a member of the Vermillion County Board or the Board as a whole, you can think, you know, maybe the brickyard is going to prevail in front of the control board. We ought to be over there yelling bloody murder. I don't believe that inference is the right inference. But even if the court were inclined to make that sort of inference, Section 39 requires proof of local siting. The word proof is not photocopies attached to your application. Proof is evidence. Evidence is something that is certified, that shows it's complete. No, we're not talking about the nature of the proof. The brickyard's point is we don't have to do this at all. So the silence could essentially be enough to prove. Well, maybe that's not so much silence, and I understand your point about it, but it's a little troubling that essentially what you're arguing is that they didn't comply with the statutory provision designed to protect Vermillion County. And we directed them to the application and said file that application. So, you know, and it's, I think, an entirely appropriate argument for you to make, but the people who are being protected, in your sense, could have been here and said, he's right. Well, let's back up and let's ask if I could defer the question of whether there could be an intervention. Because I think the answer is yes, but let's confirm that. And if there's not an answer to that, I'll certainly provide the court with the answer. But assuming there could be an intervention by Vermillion County, I think the question is, what do we do with the silence? Does the silence suggest consent, or does the silence suggest they're going to stand on their statutory obligations and know that the agency would do as it did, which is to say, you can't pass go. You have to have this form. I think it's a perfectly reasonable inference to the other side, Your Honor, to say, Vermillion County didn't need to do anything because they knew when it got to the agency it was going to get bounced. And that's exactly what happened. So I think the decisions in the MIG case from the Supreme Court and by state are very clear about what a boundary is and what an expansion beyond a boundary is. If the court takes a look at those cases, I think you'll come to the conclusion this is not what is envisioned by those courts in talking about a new pollution control facility. I have some comments here about the board decisions that my opponent has raised. My brief, though, distinguishes those cases to the extent that it comes up. I'll talk about it in rebuttal unless there are other questions. I don't see it. We'd ask that the court reverse the Pollution Control Board's decision. Thank you. Mr. Powell? May it please the Court. At this stage, this case involves only one of the two grounds on which the Illinois EPA or agency found Rickard's permit application incomplete. That is that the proposed modification required additional local siting approval. The board's rejection of that ground presents two issues on appeal. First, whether the board's interpretation of the Environmental Protection Act or Act is entitled to deference. And second, whether the board applying that construction correctly found Rickard's proposed permit modification does not create a new pollution control facility. I'll now explain why the board got both issues right. First, the board correctly interpreted the statutory phrase, new pollution control facility, which the Act defines as relevant here as, quote, the area of expansion beyond the boundary of a currently permitted pollution control facility. This provision is silent as to which boundary, if there are two, as here, cited are permanent controls. Despite the lack of any qualifier of boundary, the term boundary, the agency claims the language is somehow unambiguous. But the agency's would-be qualifier, currently permitted, in quotes, clearly modifies the immediately following phrase, pollution control facility, not the term boundary. To resolve this statutory ambiguity, the board sought to further the siting amendment's purpose, to give local governments a voice in making decisions that affect them. It follows the legislature intended that only expansions beyond boundaries set at siting would require local siting approval, or new local siting approval. The agency's contrary interpretation, which instead makes the permitted boundaries control, undermines that intent. This also unsound policy, thus requiring unnecessary rounds of local siting review, wastes time and resources of the local government, as well as the permanent applicant. The siting review process is often expensive and extensive and time-consuming, and these burdens aren't eliminated simply because the local government is entitled to recoup some of its costs at the back end, as the agency points out. The agency places heavy reliance on the MIG and bi-state cases. We believe that reliance is misplaced. Those cases in deciding whether proposed landfill expansions require local siting look to agency-permitted boundaries. That much we agree on. But that is because, unlike Brickyard's facility, those landfills had never been through local siting, and instead operated from the beginning under agency permits. Now, it's true that Brickyard's facility also developed initially under an agency permit before the siting amendments went into effect. It later, in 1992, secured local siting approval. Accordingly, the MIG and bi-state decisions are wholly inopposite here. In this case, we submit this case as systhetic, more akin to the waste management decision of the board, which the board appropriately followed here. There, the proposed redesign did cross some agency-permitted waste contours, but no sited limits. The agency argued there, as they do here, that the redesign required new local siting approval. The board rejected that claim, finding that since the reconfiguration crossed no sited boundaries, the reconfiguration would not create a new pollution control facility. Mr. Powell, you and Mr. Eulitz both signed the proposition of law, the complicated technical stuff, and called upon to interpret a statute that the court should give deference to the agency involved in making that call initially. He says it's the agency, and you say it's the board. How are we supposed to decide between those two claims? It's correct, Your Honor, that that is their argument, and our argument is that the agency may be sort of at the front end, the gatekeeper, but ultimately, final permitting decisions of the agency are appealable to the board, as happened here. So it's the board's decision, ultimately, that the court reviews. And so it's our position that the board's interpretation is to tell the deference, not the agency's. We've been doing this for a long time, but I don't recall this particular issue ever coming up before, where we're competing agencies of the state in the same area. You're dealing with environmental matters. Environmental, the Pollution Control Board is concerned with environmental matters, and Illinois Environmental Protection Agency. Is there any case law where courts have chosen which of these two arguments is the more persuasive? And, of course, it's only a matter of is it helpful or persuasive. It's ultimately still our call, but it would be nice to see which of these two arguments has been deemed the more persuasive. Has any other court addressed it? I'm not aware of any decision directly on point, Your Honor, making that call between the agency and the board. So, no, the short answer is no. I still believe, or submit, that the board has the final say in reviewing the agency's decision. So it's the board's interpretation to which deference is due, not the agency's? That's our position, Your Honor. Okay, go ahead. The agency urges this court to limit waste management, which I mentioned in the board decision, to its facts. But, plainly, the board's rationale in that case, that the landfill's permanent footprint has not retroactively become a site approval condition, is fully apt here. Under the correct statutory reading, the board rightly concluded that Brickyard's proposal does not require additional siting approval. Just to recap, in 1992, Vermillion County approved by resolution expansions in two directions. One is a lateral expansion of some 21 acres. That's not an issue here. But, also, the county approved a 40-foot vertical expansion over a portion of the land. That's the expansion that's at issue here. Now, the siting applications, Brickyard's siting applications depiction of the expansion shows units one and two, which is where the wedge ended up ultimately being added, right next to each other, with no area of separation at all. This is in 1992. Moreover, the siting approval resolution did not impose any volumetric limit on the landfill's waste capacity, nor did it require a wedge, waste-free or otherwise, or otherwise restrict use of the interior of the expanded landfill for waste disposal. Brickyard's proposed change would make the interior wedge added by the agency in permitting three years after local siting approval open to waste rather than just clean fill. The wedge runs from the 40-foot landfill ceiling expansion approved by the county down through the grandfathered, existing landfill below. What was the purpose of the wedge to begin with? Your Honor, I believe it was to separate units one and two. Why? Because they are subject to different regulations because of their relative ages, and to sort of maintain a barrier or a berm between them so that groundwater monitoring, that sort of thing. You're using the word berm and barrier. Yes. They want to remove the barrier. That's correct, yes. Well, then, what do we do about this idea of there being a barrier or protecting one from two and protecting one and two from whatever's going to be in the middle? Well, certainly, Your Honor, it is conceivable that if the case proceeds as we believe it should, for the agency or the permit does, the agency could say this is not technically, this application is not technically sufficient. There's a problem with it violates the act for any number of reasons. But that's the process that we submit this application should have gone through, not an additional round of local siting. Can it still go through that? It can still go through that if this court affirms and it's remanded to the agency, the permit is. The technical review of the permit will proceed. Then it might, you mean like then the agency might say, yeah, okay, we're going to let you do it, but it's subject to such and such and such and such. Yes, Your Honor. Which would be protections. Yes. Permit conditions are quite common. And there are general conditions and then specific ones can be added as needed. It's a full process in its own right. For the agency only, though, it doesn't involve the local siting authority. I just want to turn quickly to some of the claims about the scope of the 1992 siting approval, that somehow the lower portion of the wedge is not within what was cited. But it stands to reason that the county applied the siting criteria, section 39.2 of the act, the nine criteria, on the understanding that the entire interior below the landfill ceiling could be filled with waste. I see that my time is up. And unless there are any further questions, we'll rest on our brief on any other issues. The Board asks that this Court affirm the Board's summary judgment and reconsideration orders. Thank you. Thank you, Counsel. Ms. Manning. May it please the Court, good afternoon, Your Honors. This is a straightforward interpretation of the act. And unfortunately, the EPA is confusing principles of permitting and siting. This case is a case of first impressions of sort in front of the Court, not in front of the Board, because it involves the question of, it involves a difference between permitting boundaries and siting boundaries. Just a segment to answer. Go ahead. Speaking only for myself, you might be making the mistake of assuming that I know too much or understand too well, and I don't. The distinction you just drew, permitting and siting, is something you need to explain so I understand what this distinction is before you go on. All right. I am happy to do that. And when the siting law was created in 1981, it gave certain discretion to local government to, in an expansion, when there is a new public, a new pollution control facility, which is defined as an expansion, an area of expansion beyond the boundaries of a currently permitted facility, that the local government then has to cite that. Our contention is they did that. Vermilion County did that in 1992. The boundary they established in 1992 is the boundary that is the operative boundaries for purposes of your Court's attention in this matter. That's exactly what the Board decided. The Board applied two of its own cases where they did look at situations where it had already been cited. The expansion here in Vermilion County, this wedge that you're concerned about, didn't occur until three to five years after siting by virtue of permitting that occurred. Because at the time, the company was told by the EPA that they needed to have this area of separation in order to close a portion of the landfill pursuant to the new regulations. We contend that, regulatorily, that is not necessary. And we contend that we can prove that in a technical review of this application, which the agency did not do because they said we need further citing. There is no further citing that needs to be done here because Vermilion County, in fact, we stipulated to FACTS that they authorized, in 1992, an expansion of the facility that had been permitted at the time by expanding the entirety of the landform by 40 feet. The agency argues, well, they didn't include the bottom of the wedge portion. Well, most certainly they did. And the Board got it right in terms of looking at the boundary that's key here, for terms of whether you have to go back to Vermilion County or not, is the boundary that was cited by Vermilion County. The MIG case and the bi-state case, both of those cases the court was faced with a situation where there had never been local citing before. So all they could look at was the permitted boundaries of the agency in terms of where you place waste. And the court said, well, you know, we're going to look at the permitted boundaries of the agency. The Board, rightly in this case, said, no, that's not what you do when we've already gone to local citing. And they used two of their cases that they had decided previously, one involving waste management, the other one involving Saline County. And they basically read those cases to say, when they've already achieved citing, what we have to do is look to see what boundary it is that the county cited. Because if what they're doing to do is to place waste within that boundary that the county cited, then they're not creating a new pollution control facility for purposes of the Act. And the Board got that absolutely right. Justice Steigman, you asked about is there case law in terms of whether you give deference to the agency or the Board in this matter. There most certainly is. The Town and Country case, the Grigolite case of this fourth district many years ago. The only reason we're here in terms of the special jurisdiction of the Appellate Court is because Section 41 allows you to review decisions of the Board, not decisions of the agency. And to further explain, the Board is the one that has the most experience in terms of reviewing and applying the citing provisions of the Act. Because it's the Board who reviews local government's decisions on citing. The agency wants to turn this into a strict permitting case, but all the agency does is it's a gatekeeper in terms of allowing a permit to process. And the Act says that if the applicant submits proof to the agency that the location of the facility has been approved, then they're obligated to process that permit. Well, three years ago they said, you haven't submitted that kind of proof. Well, in fact, we have. The Board found that we had. It's clear that the Vermilion County decision contemplated waste within this area that's called the wedge. That permit boundary has only been established by the agency in dealing with the vagaries of EPA permitting. And what the agency... Go ahead. Sure. You said that the 1992 citing clearly contemplated the use of the wedge? Absolutely. And clearly contemplated that there would be waste in that area. And the Board so found. So that's why Vermilion County isn't here. And just as connect you ask, could Vermilion County be here? Of course they could. Saline County was an intervener in the Saline County case. The agency talks about the City of Waukegan case and tells you, well, you know, it's our wheelhouse that you have to look at here. Well, no. City of Waukegan in that case, City of Waukegan filed a declaratory ruling judgment against the agency because the agency allowed a bios, a pollution control facility to be constructed without going through citing, and Waukegan didn't like it. So they knew that they could come to the court and argue for the court to be heard or the Board to hear it. And, in fact, in this case, it's very clear that the permit application, both the original application, and the supplementary application, was sent to the County Board Chairman. It was sent to the State's Attorney of Vermilion County, and that is all in our brief. And that's what the law requires. And it described exactly what my client wants to do. It described we are going to put waste in this area of wedge that has been, that's currently not permitted to accept waste. The Board's decision is true to every statutory construction argument that is appropriate. Number one, they read the plain language of the act. The courts cannot read language into a statute that isn't there, but the agency wants you to read the word waste boundaries, permitted waste boundaries of the EPA, to deny the ability to put waste in an area that was cited and permitted to accept waste. I have this question. Go ahead. How, when they originally got site approval from the county, that it was fully contemplated that the entire site, including this wedge area, would be so utilized for waste? Absolutely. Had no reason, that's what the Board found. The county had no reason to presume that waste wouldn't be there. So, the initial, this wedge area we're talking about now, was there any such designation back in 1992, that reserving any portion of it? There was that, Your Honor. Okay, then the next question is, from 1992 until now, why wasn't it used by lubricant? Because it was permitted to only put clean fill into the area. And now that they're ready to develop that area, they have determined that we want to not put clean fill into that area, which is very expensive, obviously, to put clean fill between these two units. And they want to be heard, and they want to have a technical review of an application that would allow them to put municipal solid waste in that area. The Board found they could do that. What do you expect when you go through the technical review process? Will the EPA say, let's assume they say, yes, you can do that, but you have to do thus and so with the liner or with the other protections? That's exactly right, Your Honor. And we presented that in the application. They just didn't review it technically. Now, at that stage, during this technical review process, is there any opportunity for Vermilion County to participate? Absolutely. Or if they don't like the conditions that you accept, Vermilion County could pop up and say, we don't like that. There aren't sufficient safeguards to prevent groundwater pollution. Absolutely, they can do that. There is no prohibition whatsoever from the county participating in any board proceeding in any permit process. It's clear from the 47,000-page record they presented in this two-paragraph denial here that, in fact, the county board was aware of this and could have participated should it wanted to. One other question. Time's up and I want to get this clarified. You say, again, the wedge area was contemplated for use in the 1992 permit that was approved by the county. Was there, and now you've explained that, what's it called, clean fill has been used? Yes. Okay. Now, in that permit, was there a distinction drawn within the boundaries of the facility? What was going to be put where at that time so that even if it could be said the wedge was contemplated to be used, it would only be used in a certain fashion? In the 1995 agency permit, they just required there to be a separation by clean fill from Unit 1 and Unit 2. Clearly, the county board did not anticipate any of that. In fact, the permit reviewers of the agency in the record actually said that. It's included on page 33 of our brief. The reviewers actually said the proposed modification, these are the EPA engineers who looked at this application that has not been reviewed. The proposed modification is not anything outside of the proposed siting application of 1999. We found nothing in these siting plan sheets that prohibit waste disposal in the wedge fill that is the subject of this file review. The permit engineers looking at this knew that that was something that came into pass later after the siting. Clearly, Vermilion County would have no reason to know, as the board found, that waste would not be in that particular area. Vermilion County did not have any volumetric restrictions on the amount of waste like some counties do when they do siting. They basically said, this is going to be our landform. We're raising it by 40, 50 feet. It's a maximum height of 715 feet, and it's one contiguous, coterminous mound. That's what they approved in siting. That is the relevant and operative boundary, I think, for your court's decision, and that is consistent with MIG, it's consistent with bi-state, and it's consistent with the board's decisions in this matter, too. So we ask that you affirm the board's decision. It was very well regarded and very well thought out. It reviewed all of the arguments by the agency. It found them wanting, and we would hope that this court does as well. Thank you. Thank you, Ms. Manning. Rebuttal arguments? First, I'd ask the court for leave to address the intervention question. I just don't know what the answer is, and I'd prefer to let the court know whether Vermilion County could or could not appear. I propose filing a letter to the court, if that would be all right. Clarify again, you're requesting leave to do what? I'd like to file a letter explaining to the court what the law is with regard to whether a county could intervene at the agency level. Not having seen what it is you're proposing to file, we'll consider it when it is filed. Well, actually, isn't it not at the agency level, at the board level? Yes. After the agency says, now we're not going to do this, and they took the matter to the board, that's really… I'd like to address that question. Okay. Your Honors, the bi-state and the more important, the MIG decision from the Supreme Court, are crystal clear about what Section 3330 requires with regard to the area of expansion. Both of those courts measured an expansion of a landfill against the current, the existing permit at the time of the application. They looked at the permit application, they saw the boundaries, they used that as the area of expansion. Ms. Manning argues that the reason the court didn't look to local siting boundaries was because they weren't available to the Supreme Court and the appellate court when those decisions were issued. That's an argument which might have some weight if the court lamented in the decisions, not having local siting boundaries. But the court in neither of those decisions lamented that at all. What the courts did in those decisions was they looked at the statutory language, area of expansion beyond the boundary of the currently, or the area of expansion beyond the boundary of a currently permitted pollution control facility, and then they looked to the permits. And bi-state makes clear that when it's the permits that are being looked at, it's not old permits, it's the permits, I want to get the quote correct, as of the present time. That's the language that's used in bi-state. Which permit matters? As of the present time, 203 Illab 3rd at 1027. So the courts in those two decisions, and those are the only two decisions we're talking about right now, looked to permit boundaries, not siting boundaries. But isn't that nonetheless, as Ms. Manning argues, the context in which they decided this case? Your Honor, could limit those cases to those fact patterns, but I would suggest that both of those decisions were decided after 1981, so the court knew that local siting was a thing, and never in any of those decisions or that discussion was anyone concerned about local siting. The courts applied the statutory languages written. I think who should get deference is a bit of a red herring, because my argument is that there isn't any ambiguity here. With regard to the statute, the phrase in question, the area of expansion beyond the boundary of a currently permitted pollution control facility, that everyone's arguing about, isn't what you're asking us to do in statutory construction to read this as if it says permitted boundaries, in other words, not just boundaries of the currently permitted pollution control facilities, but permitted boundaries. And isn't that in effect an argument that we should be amending the statute? No, Your Honor. I believe that the boundary of a currently permitted pollution control facility is precisely the same as beyond the currently permitted pollution control facility's boundary. It doesn't matter, I believe, whether the General Assembly is modifying the word boundary before or after. The board makes the argument that there's nothing before the word boundary to tell the court what boundary refers to and then jumps into an ambiguity argument. And my argument is the word boundary in the statute is modified by what follows of the currently permitted pollution control facility. What about Ms. Manning's argument that the word was fully contemplated as being used for waste when it was approved by Vermilion County in 1992? In 1995, the contours of the facility were changed. The floor was lowered, the slopes were changed, and the top was thin, and a million cubic square yards of material was added to the facility in 1995. Okay? And we have the record shows that when that was done... This is a difficult area for me. I'm hardly an expert in this. I don't have the expertise of any council, which is why it's important you answer the question I asked. The question I asked was to respond to her argument that the wedge was contemplated to be used for waste disposal when Vermilion County approved it in 1992. Yes. Address that. Yes, it was contemplated to hold waste in 1990, or we think it might have been because the record... So you heard what she says. Oh, definitely it was, and so forth. Well, if that's the case, then why... How is it that this is not within the boundaries of an area that was designed for permitted use? Because when the local government, Vermilion County, contemplated in 1992, if they did, waste in that space, the floor of the facility was higher, the slopes were different. We have a different unit now, a different facility now. This is 2015 this application comes in, and the question is always, always in this case, in all these cases, is the scope and nature of the facility being changed. That's what the Supreme Court said is the touchstone. My argument is if you're going to expand the facility's life five years, you are certainly changing its scope and nature. Again, going back to this, you're talking about how the facility is going to be used differently than maybe it was contemplated, but I guess maybe it's just a question of macro versus micro. In a macro sense, in 1992, it was understood it was going to be used for waste. Now you're talking about since 1995, things changed on how that waste might be put there, but isn't that now a matter for the board and the agency with their technical expertise to decide, is this being done appropriately and so on, as opposed to, as your argument is, once again, the county's got to be involved here. Well, the county approved this area for waste, didn't it? In 1992 is the argument that my opponents are making. They approved the area for waste, but in 2015, whether the county would approve it in its current form is an open question. In its current, you mean? As Manny said, it's one land form. It has a certain shape, but it's lower. The wedge was approved in 1992 for waste disposal. In 1995 and 2015, there are different issues now on how that waste is going to be disposed, but your argument seems to be, as reading into this statute, that any change in the method or the means of waste disposal would affect whether or not the county would approve, as opposed to the expertise of initially the agency and then the board. Is this being done appropriately so as to protect the environment? Actually, my argument is that this proposal will expand the volume of waste at the site, and the Supreme Court has said any expansion of waste is a change in the scope and nature requiring local siting, and they haven't given us proof of local siting. If there were more efficient means of disposing of waste within that sited area, which would itself increase the volume, would that require? I don't think that's possible as a matter of physics, right? I mean, you can be more efficient and pack in more waste, but the volume will stay the same. The boundaries that establish what the volume is, as long as they don't change, it's unlikely you're going to affect the scope and nature. But here, we're actually closing an area that is off limits to waste and putting waste there. So I suppose more efficiency wouldn't change volume. It would just change the volume. You've got to be more efficient to get more waste in that space. But I want to make sure I answer all your questions. I assume my time is up. Thank you, Your Honors. I will file that motion to the extent that we need to. Thank you. All right. Thank you. Thank you all.  So, ladies and gentlemen.